CARLINGFORD AUSTRALIA GENERAL INSURANCE LIMITED (Formerly Preservatrice Skandia Insurance Ltd.), Plaintiff,

v.

ST. PAUL FIRE & MARINE INSURANCE COMPANY, Aetna Insurance Company, Cigna Corporation and Marsh & McLennan, Inc., Defendant.

No. 86 Civ. 9011 (CSH).

United States District Court, S.D. New York.

Sept. 27, 1989.

Mendes & Mount, New York City (Mary Ann D'Amato, Peter W. Birkett, of counsel), for plaintiff.

Miller Singer, Raives & Brandes, P.C., New York City (Lawrence I. Brandes, of counsel), for Aetna Ins. Co., St. Paul Fire & Marine Ins. Co. and CIGNA Corp.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In this diversity action on a policy of reinsurance, defendant reinsurers move under Rules 13(f) and 15(a), F.R.Civ.P., to amend their answers to assert an affirmative defense and a counterclaim for re-scission. Defendants state that if the amendment is allowed, they will move on its basis for summary judgment under Rule 56. Plaintiff reinsured resists the amendment on the ground *inter alia* of legal insufficiency.

### Background

Plaintiff Carlingford Australia General Insurance Limited is an Australian insurance company, as was its predecessor in interest, Preservatrice Skandia Insurance, Ltd. (PSIL). Effective June 1, 1982 PSIL issued a worker's compensation policy to a group of Australian companies known as Courtaulds–Nilsen. The coverage ran from June 30, 1982 to June 30, 1983. Under that coverage plaintiff (as I shall now collectively refer to PSIL and its successor in interest Carlingford) had unlimited liability for all worker's compensation losses suffered by its insured Courtauldus–Nilsen. Specific premiums for that unlimited coverage were not set in advance. Rather, plaintiff was entitled to receive from the insured premiums equal to the amount of all losses paid to a maximum of $1,550,000. (All amounts stated herein are in Australian currency). In addition, plaintiff was to receive an administration fee of $275,000. Under its policy with Courtaulds–Nilsen, all losses in excess of $1,550,000 would be paid by plaintiff without recourse to its insured.

In these circumstances, plaintiff sought reinsurance. Plaintiff hired the broker defendant, Marsh & McLennan, Inc., as its agent to secure reinsurance of the policy in the American market. Marsh & McLennan, on behalf of plaintiff, entered into negotiations with the American Foreign Insurance Association (AFIA), an underwriting manager and agent for a pool of insurance companies including the defendant insurance companies. Malcolm Dodwell, an Australian and at the time plaintiff's liability manager, participated in these negotiations. Anthony Recanatini of AFIA conducted the negotiations on behalf of the proposed reinsurers. After the conclusion of these negotiations, plaintiffs obtained reinsurance of 100% of a layer of $4,000,-000 in excess of $1,000,000. According to

the amended complaint, the companies bound on this policy of reinsurance are defendants St. Paul Fire and Marine Insurance Company, Aetna Insurance Company, and CIGNA Corporation. There appears to be some dispute as to the identity of the companies bound on the policy, but I need not resolve it for purposes of this motion. The companies so bound are hereinafter referred to as the reinsurers.

Plaintiff also obtained coverage of $5,000,000 excess of $5,000,000 from another reinsurance source, not involved in this litigation. In consequence of its arrangement with Courtaulds–Nilsen and these two reinsurance policies, plaintiff was fully reinsured for losses up to $10,000,000.

This litigation commenced with a dispute as to whether the reinsurance policy at bar was on an aggregate or on a per occurrence basis. Reinsurance on an aggregate basis requires the reinsurers to pay once plaintiff's total payments on the Courtaulds–Nilsen coverage exceeded $1,000,000. If the coverage is on a per occurrence basis, then the reinsurers are not obligated to make payment to plaintiff unless and until plaintiff's loss payments on any single occurrence exceed $1,000,000.

The case for plaintiff is that it sought, paid for and obtained reinsurance on an aggregate basis. It appears to be common ground that plaintiff's aggregate loss payments on all workers' compensation occurrences during the policy period are expected to exceed $5,000,000. Accordingly, if plaintiff is correct the reinsurers would owe plaintiff $4,000,000 on the reinsurance policy at bar. The case for the reinsurers is that all plaintiff obtained was reinsurance on a per occurrence basis, and, since no single occurrence has resulted in a loss payment by plaintiff in excess of $1,000,000, the reinsurers have no liability.

Plaintiff commenced this action against the reinsurers to enforce its perception of the reinsurance policy. Plaintiff added its broker, Marsh & McLennan, on the basis that if Marsh & McLennan did not in fact obtain the aggregate reinsurance plaintiff requested, Marsh & McLennan is liable for its failure to do so.

The issues were posed thus until, after considerable difficulty and delay, the reinsurers took the deposition of Malcolm Dodwell, who by then had left plaintiff's employ. The reinsurers promptly made the present motion to amend their answers to assert an affirmative defense and a counterclaim for rescission of the reinsurance policy.

The reinsurers claim the right of recession on the ground that plaintiff concealed material facts affecting the reinsurance risk. During his deposition Dodwell is said to have made the following admissions:

a) PSIL had initially rejected the risk and declined to issue the Policy in accordance with its decision to cease writing Australian workers compensation business because such risks were unprofitable;

b) PSIL knew that if it could obtain reinsurance on an aggregate basis, PSIL was guaranteed a profit of $600,000 on the Policy while the entire risk of loss was shifted to the reinsurer, and that this is material information which a reinsured is obligated to disclose to a prospective reinsurer;

c) none of these facts were ever disclosed to the Reinsurer's agent, AFIA. Reinsurers' Main Brief at 7.

Plaintiff quarrels with these characterizations of Dodwell's testimony. Plaintiff also contends that its premium arrangements with its insured on the underlying policy are immaterial as a matter of law to the reinsurance. Quite to the contrary, the reinsurers say: they regard Dodwell's testimony as entitling them to summary judgment dismissing the complaint if, in fact, the reinsurance policy is on an aggregate basis.

In a memorandum opinion dated July 5, 1989, familiarity with which is assumed, the Court directed a further exchange of briefs on the materiality of the non-disclosures underlying the counterclaim. Those briefs are now at hand.

### Discussion

The reinsurers rely upon the traditional liberality with which amendments to plead-

ings are allowed under the rules. In *Foman v. Davis*, 371 U.S. 178, 181, 83 S.Ct. 227, 229–230, 9 L.Ed.2d 222 (1962) the Supreme Court said: "If the underlying facts or circumstances relied upon by a [party] may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."

The reinsurers purport to find in this Court's July 5, 1989 opinion an implicit recognition of their counterclaim's viability, so that the amendment must be allowed without further analysis. The reinsurers misread the opinion, which contains judicial ruminations on possible materiality, but did not undertake to answer the very question it posed. The further briefs of counsel were useful to the analysis which follows.

█ It is common ground that Dodwell did not advise Recanatini or any other reinsurers' representative of plaintiff's premium arrangements with Courtaulds–Nilsen. The reinsurers say that non-disclosure, viewed in the context of plaintiff's perception that underwriting Australian worker's compensation was "unprofitable", bring the case squarely within *Sun Mutual Insurance Company v. Ocean Insurance Company*, 107 U.S. 485, 1 S.Ct. 582, 27 L.Ed. 337 (1883).

*Sun* holds that a reinsured, like any insured, owes its insurer full disclosure of material facts affecting the risk, including overinsurance. No one would quarrel with these general propositions; but *Sun's* facts do not particularly resemble those at bar.

*Sun* involved a marine policy which "although, in substance a re-insurance, was not so in form." 107 U.S. at 500, 1 S.Ct. at 591. The covered vessel was chartered to carry a cargo from New York to San Francisco. A second charter called for her to sail from New York to San Francisco and thence to Calao, Peru and the Chincha Islands to load a cargo of guano for Rotterdam. The Ocean Insurance Company, the insurer, had full knowledge of both charters and insured the vessel against various risks attendant upon them. Ocean then obtained reinsurance from Sun in a binder which did not refer expressly to the second charter, and of which Sun had no knowl-

edge. The vessel having been lost on her way to San Francisco, Ocean paid on its policy with the insured and then sought to recover in respect of both charters from Sun as reinsurer.

The Supreme Court rejected the claim. First it analyzed the scope of the reinsurance contract's coverage. The issue posed that basic inquiry of the law of contracts: "whether the minds of the parties in fact met in a common understanding, so as to consummate the contract sued on." *Id.* at 505, 1 S.Ct. at 595. The Court continued: "The Sun Company must have intended to insure an interest in the Rotterdam charter"; Sun being ignorant of that charter, was not contractually bound to reinsure losses in respect of it. *Id.* at 505–507, 1 S.Ct. at 595–597.

Alternatively, the Court reasoned that inclusion of all the vessel owners' losses in the reinsurance of the one charter known to the reinsurer would constitute over insurance of that charter to such an extent that it would be material to the reinsurer's risk/premium assessment, to the extent that "it is reasonable to believe that a prudent underwriter would not have accepted the proposal as made", *id.* at 509–510, 1 S.Ct. at 599.

In the case at bar, the reinsurers were fully advised of the extent of the underlying risk, *i.e.*, worker's compensation claims against Courtaulds–Nilsen. In that significant respect this case differs from *Sun*. The reinsurers charge plaintiff with concealing its own premium arrangements: a factor nowhere implicated in *Sun*.

The reinsurers cite no case holding that a reinsured must disclose its own premiums when seeking reinsurance. The Second Circuit case closest in point refused to impose that duty. In *China Union Lines v. American Marine Underwriters*, 755 F.2d 26 (2d Cir.1985), following the insured vessel's loss certain reinsurers sought to avoid liability on the ground that the reinsured failed to disclose higher premiums paid to other reinsurers of the risk in the London market. The court of appeals rejected the argument:

There is no merit in Calvert's argument that Health should have disclosed the difference in premiums at the outset, because, Calvert asserts, it was a factor that materially affected the risk. *See Btesh v. Royal Ins. Co., Ltd.,* 49 F.2d 720 (2d Cir.1931); 9 *Couch on Insurance 2d* § 38:76 (1962). Appellant's own witness testified that it is common for premiums on the same risk to vary as between insurers, and silence concerning well-established practices and matters of general knowledge does not affect the validity of a marine insurance contract, *Anne Quinn Corp. v. American Manufacturers Mutual Ins. Co.,* 369 F.Supp. 1312, 1315 (S.D.N.Y.1973). *aff'd mem.,* 505 F.2d 727 (2d Cir.1974). Moreover, there is little if any relationship between such variances in premium and the gravity of the risk. An insurer weighs its exposure against the premium which it itself, receives.

755 F.2d at 29.

Notwithstanding its result, *China Union* leaves open the conceptual possibility that particular premium arrangements between insured and reinsured may materially affect the reinsurer's risk. Indeed, that is the main thrust of the present reinsurers' argument. They say that since plaintiff's premium agreements with Courtaulds–Nilsen guaranteed plaintiff a profit, plaintiff had no incentive to investigate claims or minimize loss payments. The reinsurers say that Dodwell in his deposition conceded the materiality of that non-disclosure, and that expert witnesses (whose names are not given and from whom no affidavits appear) will testify at trial that plaintiff's premiums should have been revealed when the reinsurance was negotiated. An admission of materiality is said to arise from testimony Dodwell gave at Tr. 13–14 of his deposition. The reinsurers were represented by Mr. Brandes. Mr. Bianca represented plaintiff. Dodwell gave this testimony under questioning by Mr. Brandes:

Q. I don't want to put words in your mouth, so if what I am saying is wrong, say so. But was it your understanding that most reinsurers generally wanted you as the seeding company, to retain a share of the risk?

A. Yes.

Q. Would you say that was more or less a common practice among reinsurers?

A. Yes.

Q. If there were ever an instance where you were seeking to buy reinsurance so that you would be eliminating your risk entirely, was that something that you would feel obligated to disclose to the reinsurers?

MR. BIANCA: I am going to object to the question simply because there is no foundation in this case, or in this record that those circumstances are in existence.

I will allow the witness to answer the question, however.

MR. BRANDES: Could you read back the question, please?

(Whereupon, the pending question was read back by the Reporter, as requested.)

A. Yes.

There is substance to Mr. Bianca's objection as to form. Plaintiff was not "eliminating [its] risk entirely" by reinsurance. As to the first $1,550,000 in loss payments, plaintiff depended upon the solvency of Courtaulds–Nilsen for reimbursement. Secondly plaintiff remained at risk for losses in excess of $10,000,000; and in these days of potential technological catastrophe (*compare* asbestos), who could say with certainty that such amounts were impossible? Indeed, the projection appears to be losses in excess of $5,000,000 for the covered year. However, the question remains whether plaintiff in practical as opposed to theoretical terms entirely eliminated its risk by this combination of premium arrangements and reinsurance. If that be so, Dodwell's testimony supports the reinsurers' theory of duty to disclose.

Plaintiff points to the deposition of Recanatini, who represented the reinsurers in negotiations with Dodwell and plaintiff's broker, and apparently evidenced no interest in plaintiff's premium arrangements. Recanatini was shown documents reflecting the Courtaulds–Nilsen worker's compensation claims experience for a number

of prior years. He then described the manner in which he analyzes a proposed reinsurance contract:

Q. Can you tell us as a matter of your practice how you would go about underwriting a Worker's Comp re-insurance proposal?

A. Okay.

First off, obviously it's gathering of the necessary underwriting data. That being details of the nature of the insured's operations, the various job classifications of the proceeds, the payrolls or wages, the specific rates.

In this case the rates promulgated by the various provinces in Australia, reviewing the past loss experience, usually three to five years.

Reviewing and obtaining details on large claims, excess of some arbitrary amount which could vary by account.

Generally asking questions like where was the account insured before, why are they seeking insurance elsewhere, if they are changing insurance companies.

Does the producer control the account right now, various what we call market intelligence gathering.

Once the underwriting data is complete in the mind of the underwriter and having reviewed it, then he approaches it from the standpoint of whether he wants to further entertain the account by actually quoting it or not.

Q. Did you quote the account in this case?

A. Yes, I did.

Tr. 52–53.

Recanatini's lack of interest in what the reinsurers now claim to be crucial militates against a finding that plaintiff's premium arrangements were material to the reinsurers's risk. But the Recanatini testimony does not entirely meet that obligation of good faith disclosure at least suggested by the Dodwell testimony.

Plaintiff cannot deny that in respect of losses between $1,000,000 and $1,550,000 it was guaranteed a profit, since in that range plaintiff obtains reimbursements from Courtaulds–Nilsen and also reinsurance payments. However, plaintiff spiritedly denies that these arrangements would in any way lessen its zeal in investigating and minimizing claims.

These are plausible arguments, but they address the merits and cannot foreclose the reinsurer's opportunity under the liberal amendment rules to prove the opposite proposition.

■ Accordingly the reinsurers' motion is granted. The motion was timely made following the Dodwell deposition. Plaintiff's claim of prejudice means no more than that the amendment is unwelcome. The reinsurers may file and serve the proposed amended pleading within twenty (20) days of the date of this opinion. Plaintiff is directed to answer the counterclaim within the time specified by the rules of procedure.[1]

The parties are further directed to attend a status conference on December 1 at 2:00 p.m. in Courtroom 307.

It is SO ORDERED.

---

1. In reaching this consideration I give no weight to whether or not plaintiff found Australian worker's compensation coverage profitable. A reinsurer fully advised of the insured's prior claims experience (as were reinsurers at bar) then "weighs its exposure against the premium which it, itself, receives." *China Union Lines, supra,* at 29. In that calculus the reinsured's profit plays no part.

What is said in text indicates the futility of a motion for summary judgment by the reinsurers based upon the present record. It is not just that at the time of his deposition Dodwell was no longer an employee of plaintiff, so that his testimony does not constitute an admission. *See* Rule 32(a)(2), F.R.Civ.P.; Rule 801(d)(2)(D), F.R.Evid. Counsel's objection to the form of the key question preserves an ambiguity in Dodwell's testimony; and there is an arguable conflict between Dodwell's testimony and that of Recanatini. In short, whether plaintiff's nondisclosure of its premium arrangements with the insured sufficiently affected the gravity of the reinsurers' risk to constitute a material omission poses an issue of fact precluding summary judgment, at least on this record.